(March 4, 1892.)

## STATE v. O'BRIEN ET AL.

[29 Pac. 38.]

MURDER IN SECOND DEGREE.—Evidence sufficient to sustain verdict. (Syllabus by the court.)

APPEAL from District Court, Bingham County.

E. P. Blickensderfer and T. M. Stewart, for Appellants.

Where there is no evidence to support an instruction, the giving of such is an error. (Ellis v. Jeans, 7 Cal. 417; People v. Byrnes, 30 Cal. 208; Dowell v. Williams, 33 Kan. 319, 6 Pac. 603; Feineman v. Sachs, 33 Kan. 621, 52 Am. Rep. 547, 7 Pac. 225.) In order to justify the inference of legal guilt from circumstantial evidence, the existence of the inculpatory facts must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of guilt. (Wills on Circumstantial Evidence, 449; Greenleaf on Evidence, 22, note.) If evidence is entirely circumstantial, each independent circumstance forming a link in the proof must appear beyond a reasonable doubt. (People v. Phipps, 39 Cal. 326; People v. Anthony, 56 Cal. 397; People v. Shuler, 28 Cal. 490; People v. Strong, 30 Cal. 151; People v. Diek, 32 Cal. 213; People v. Foley, 64 Mich. 148, 31 N. W. 94.)

George H. Roberts, Attorney General, for the State.

If the verdict is against the weight of evidence, but there is still some evidenec to justify it, a new trial will not be granted on the ground that the evidence is insufficient to justify the verdict. (Kile v. Tubbs, 32 Cal. 332; Doll v. Anderson, 27 Cal. 250.) While courts may set aside a verdict as

against the weight of evidence, they will rarely disturb the finding of a jury upon the facts. The refusal of the court to do so is not reviewable here when there is any evidence to sustain the charge. (*Harley v. State,* 6 Ohio, 399-405; *State v. Cruise,* 16 Mo. 391; *Wolf v. State,* 11 Ind. 231; *Giles v. State,* 6 Ga. 276-286; *State v. Elliott,* 15 Iowa, 72-79; *State v. Crytes,* 24 Ark. 183, 184.) A conspiracy may be proved by circumstances, among which are the acts of the parties in doing the injury which is the alleged object of the conspiracy. (Wood's Practice Evidence, 236; 2 Bishop's Criminal Procedure, sec. 227; *Ochs v. People,* 124 Ill. 421, 16 N. E. 662; 1 Wharton's Criminal Law, secs. 118, 860.

MORGAN, J.—The three defendants were indicted for the murder of David Stoddard. Defendant O'Brien not having been apprehended, defendants Mike and Bestone were tried before the court and a jury. The jury found the two defendants guilty of murder in the second degree, and they were sentenced to ten years each in the penitentiary. The defendants appeal from this judgment and from the order overruling the motion for a new trial. The following errors are assigned: First, the giving of the following instruction, viz.: "If the jury believe from all the evidence, beyond a reasonable doubt, that it was understood by and between the defendants and said O'Brien, after said O'Brien had been struck by Stoddard, if the jury believe that he was so struck by Stoddard, that the defendants at bar should watch Stoddard, and prevent his leaving the saloon, or detain him while on his way from said saloon, and thus enable said O'Brien to provide himself with a weapon, and give him an opportunity to kill Stoddard, or inflict serious bodily injury on him, and that in pursuance of said understanding or agreement the defendants did stop Stoddard after he left the saloon, and detain him, and thereby gave O'Brien an opportunity to kill him, the jury should find the defendants, or whichever of them did so act, guilty of murder." The defendants object to this instruction, on the ground that there is no evidence tending to prove that defendants, or either of them, stopped Stoddard on the street.

B. W. Nelson swears: "I was at Beaver Canyon, and was running the work train on the 24th of August last. Knew

these defendants, and had seen O'Brien. These men were working under Mr. Whalen, and I had charge of the train. O'Brien was an Italian, I think. Know where Poulsen's saloon is in that town, and was there on the night of the 24th of August. Went in about 8 o'clock in the evening. There were several in the saloon, among whom were these defendants O'Brien and Collier. When I went in, the larger man of these two was kicking the other man's hat, and O'Brien was talking to the brakeman. Stoddard came in while Bestone was kicking the hat about. Stoddard appeared just as Bestone was kicking the hat to the door, and he kicked Stoddard on the hand. Stoddard asked what was the matter, and Bestone said something in reply. Stoddard told them not to make so much noise. O'Brien then went up to Stoddard and said, 'Who are you?' Stoddard said, 'I am an officer, and want you to keep still.' O'Brien then made a very vile and insulting remark to Stoddard, and then turned to go toward the brakeman. Stoddard then hit him over the head with a gun [meaning a revolver.] O'Brien then turned and asked what was the matter. Stoddard asked, 'What was that you said?' O'Brien said, 'I didn't say anything.' O'Brien then went over and had some beer. Stoddard asked us all to have a drink. All came up and took something. I took a cigar. Just at the same time O'Brien and these two defendants stepped outdoors, and the three were standing there talking half a minute, and then O'Brien went toward the outfit-car, and these two went the other way by the stone store. I mean by the 'outfit-cars' the place where they live. There were four or five cars. Don't know which cars these defendants slept in. After O'Brien started I did not watch him. After I got outside I went over to the office, and sent a message to find out where we were to work next day. I think I was gone to the office fifteen or twenty minutes. I then walked over to Poulsen's saloon. Saw Stoddard standing on the plank walk, talking to these two defendants. I spoke to Stoddard, and then told these two defendants it was time they were going home. They said, 'Yes; but come and have some more beer.' I said, 'No; you must go to bed, for you will have to work to-morrow.' They said, 'All right,' and then asked Stoddard to have a drink. They

both then shook hands with Stoddard. I then put my hand on Bestone's shoulder, and he turned off to one side and again shook hands with Stoddard. Their conversation was directed to Stoddard. Don't know where these two defendants were while I went to the depot. I was about thirty-five feet from them when I first saw them. From Poulsen's to railroad track was about seventy or one hundred feet. The stone store is four or five feet from the sidewalk. These defendants were facing the saloon, and Stoddard was facing the railroad track. I was facing defendants, and had a good view of the saloon and what was in front of it. I turned around, and started to go toward the track. Had got several steps, and heard a scuffle and turned around. I saw two persons scuffling, and saw some one fall. I started toward them. Before I could get there I heard Collier say, 'Good God! He is dead.' As he said that O'Brien stepped off the platform. I stepped down. O'Brien started toward me, and I picked up a railroad link. O'Brien started off and got twenty-five or thirty feet. I threw the link at him. Struck him on the shoulder, and knocked him down. He struggled to his feet, and started toward the depot. I made a pass at him. He dodged and struck at me, missing me about eight inches. As he passed by the light I saw something shining, and said to myself, 'That is a razor.' I stepped back on the platform and asked what was wrong. There were two or three there then. They said Stoddard was dead. We carried him into the saloon. I think he took about one breath after we got him into the saloon. His head was nearly cut off. There had been two cuts, and there was nothing but the bone holding the head on. I did not see these defendants after that, and don't know where they went. When the scuffle commenced they were right ahead of me, and together. Stoddard resided across the railroad track, west from saloon, and from where he was killed. He was dead when we got him in the saloon." On cross-examination witness said: "I did not see defendants go behind the stone store, but saw them stop on the sidewalk, going west. When I left the saloon the first time there was no one in the saloon but Stoddard, Collier and two brakemen."

E. V. Collier was then called as a witness. Collier's testimony corresponds substantially with that of Nelson's down to the time that O'Brien was struck. He swears that at the time that O'Brien was struck he asked Stoddard what that was for, and then turned away, and said that he was going to bed, and walked over to the two defendants, and they went to the door. They were talking outside the door two or three minutes. I could see them through the opening in the door. After this conversation, one went southeast and the others went west. About twenty minutes after the Italians had the talk at the door Stoddard said that he would have to go to bed, and went out and started to the railroad track, west. I started with Stoddard, and about one hundred feet from Poulsen's we met these men. Stoddard was ahead of me. They came down the plank walk, and made a loud noise with their feet, and came up in front of Stoddard, and Stoddard said, 'Now what, boys?' They said, 'Me one more beer, you one more beer.' Stoddard said, 'No'; that he had beer enough. One of them had his back turned toward the building and the other was facing. Just at this time O'Brien jumped out from the buildings and cut Stoddard down. I was there only five minutes. They were directing their conversation to Stoddard, but none to me, and they asked Stoddard to drink, and shook hands with him, but not with me or Nelson. One of them shook hands with him twice, the other once. I think we were sixteen to eighteen feet from where he sprang to where we stood, and when he came he came as fast as he could. I was about five feet from him. He used a razor with about three motions, and Stoddard fell, and he went down on him. I grabbed him by the collar, and he made several cuts at me. He got loose and ran, with Nelson after him. I do not know where the defendants were at the time, or where they went. We then carried Stoddard into the house, and he died in two minutes." Collier further testified that just as O'Brien sprang out they (the defendants) turned and went away. "I did not see anything of O'Brien until he sprang out, and when he sprang these others went on."

W. H. Bassett swears that he heard of the trouble, and went into Burnside's. "I saw two Italians in front of the store talk-

ing. I don't know what about. The larger one was one of
them. As I passed the door of the saloon the second time I
saw them on the platform with Stoddard. Then I went away."

Poulsen swears that he knew O'Brien and these two defend-
ants. They were all Italians. Saw them in the saloon.
Heard O'Brien's insulting remark to Stoddard, and saw Stod-
dard strike him. After this O'Brien went and talked to these
two in their own language. They were by the door, and talked
in a low tone, and were close together, and then went away.
In about ten minutes O'Brien came back, and had something
in his hand, shining. He came in, looked around, and then
went out. I heard no noise, but some one came in and said
Stoddard was bleeding to death. The testimony of one of the
brakemen was to the same effect.

The defendant Bestone was sworn in his own behalf and
that of the other defendant, and testifies that they did not talk
to O'Brien at the door of the saloon. States that they left the
saloon, and did not stop to talk to anybody. Went down and
went to bed. States that when they left O'Brien was in the
saloon, talking to some one; that they did not shake hands with
Stoddard.

What took place in the saloon, and the conversation at the
door between the three Italians, was sworn to by four wit-
nesses. It is unquestionably true. Yet Bestone denied it posi-
tively on two occasions, and denied shaking hands with Stod-
dard and stated that they did not talk to O'Brien in the sa-
loon nor outside the saloon. Never saw him again that night.
"We talked to no one except Nelson after we left the saloon."
Did not talk with Stoddard, and repeats that he shook hands
with Nelson, no one else. It is evident that these two defend-
ants and O'Brien talked together at the door of the saloon just
after O'Brien was struck; that O'Brien left the saloon at the
same time they did; that he went for the razor, and these two
went up the sidewalk the other way, and stayed ten to twenty
minutes, lingering about, and did not come back toward the
saloon until Stoddard came out to go home; that they then
met him, and had some conversation with him, and shook
hands with him twice—every circumstance of which was denied
positively by the defendants at each of the two trials. The
excuse is made that they could not talk English well, but one

who does not talk English well can tell the truth as easily as he can tell that which is false, in broken English. No circumstance that took place that night could be forgotten, as Stoddard was killed, and they were arrested the next day for the crime. Every fact would be burned into their memories. A man can recollect as well in the Italian language as he can in English. It is evident that the defendants deliberately and intentionally testified falsely with reference to every material inculpating fact that occurred at the door of the saloon, in the saloon and on the walk where Stoddard was killed. It was contended with much earnestness by the counsel for appellants that every circumstance could be reasonably explained in a manner consistent with the innocence of the defendants. It is not explained, and it is difficult to explain why these two defendants remained on the walk, or up at the track, one to two hundred feet of the saloon, all the time O'Brien was gone in the other direction for his razor. They talked with O'Brien at the door of the saloon. Why did they not go straight across to the outfit-cars with O'Brien if they were going to bed, instead of going to near the railroad track, and remaining there while he was gone? These things are difficult to explain, but the falsehood of the defendants in regard to all these facts cannot be explained. It is unexplainable, and the fact that they could only talk in broken English is no sort of excuse for falsehood. Truth agrees with every circumstance perfectly. Falsehood agrees with nothing, is the companion of nothing except guilt. Truth is always seized upon by the innocent as a sure defense, by the guilty never. The jury saw all the witnesses upon the stand, and could judge of their truthfulness. They were carefully and fully instructed in the law by the court. The judge who tried the cause also doubtless carefully noted the testimony, and certainly would not permit a judgment of this kind to stand if there was reasonable doubt of guilt. The instruction complained of was given in view of this testimony, and the testimony is so strong and the evidence of guilt so complete that we cannot but approve of the judgment. The testimony related is a sufficient answer to the second assignment of error, which was that the evidence was insufficient to support the verdict. We think it is sufficient. Judgment affirmed.

Sullivan, C. J., and Huston, J., concur.