(December 19, 1895.)

## STATE v. NESBIT.

### [43 Pac. 66.]

GRAND LARCENY—SUFFICIENCY OF EVIDENCE.—When there is absolutely no evidence to sustain the verdict, or where the evidence so preponderates against the verdict as to justify the presumption that it was rendered under the influence of passion or prejudice, the verdict should be set aside.

SAME—VERDICT.—When the circumstances on which a verdict is based can be as reasonably explained upon some other reasonable hypothesis than that of defendant's guilt or as perfectly consistent with defendant's innocence, then a new trial should be granted.

(Syllabus by the court.)

APPEAL from District Court, Boise County.

Wyman & Wyman, for Appellant.

There are no authorities cited in their brief, the same being a statement of the case nearly the same as in the opinion, and a recitation of the evidence given on the trial.

Attorney General George M. Parsons, for the State.

The only reference in the transcript to exceptions to the instructions is as follows: "And thereupon said defendants, by their attorneys, to each, every and all of said instructions then and there duly excepted." This court has repeatedly held that such an exception is not sufficient to a charge given by the court of its own motion. Appellant cannot avail himself of this objection, and error cannot now be urged. We further call attention to the fact that the transcript nowhere shows when the

objections to the instructions were taken. (*State v. Preston*, ante, p. 215, 38 Pac. 694-696; *State v. Schieler*, ante, p. 120, 37 Pac. 272; *State v. Hurst*, ante, p. 345, 39 Pac. 554, 555.) "It is unnecessary to prove the whole of the property stated in an indictment, if, by rejection of the part not proved, the offense would be complete." (*State v. Moore*, 14 N. H. 451-455; *Swinney v. State*, 8 Smedes & M. 576-584.) "It is invariably enough to prove so much of the indictment as shows that the defendant has committed a substantive crime therein specified." (*Rex v. Hunt*, 2 Camp, 585, cited in *Swinney v. State, supra.*) There is nothing whatever in the record in the remotest degree indicating passion or prejudice. If individual jurors were biased or prejudiced, they should have been challenged. It is too late to raise this question after verdict. We simply cite the court to 1 Thompson on Trials, secs. 114-116. The assignment that the verdict is contrary to the evidence, this court has held that the question of the sufficiency of the evidence is for the jury, and if there is any legal evidence this court will not disturb the verdict on that ground. (*United States v. Camp*, 2 Idaho, 231, 10 Pac. 226; *People v. Ah Hop*, 1 Idaho, 698; *State v. Jorgenson* (Idaho), 32 Pac. 1129; *State v. Thorp*, 94 Iowa, 746, 64 N. W. 265, 266.) The appellate court will not grant a new trial on the ground that the verdict is contrary to the evidence, if the evidence is conflicting and there is any evidence to sustain the verdict. (*People v. Brown*, 27 Cal. 500; *People v. Starnge*, 61 Cal. 496; *People v. Darr*, 61 Cal. 554; *People v. Anthony*, 56 Cal. 397; *State v. O'Brien*, 3 Idaho, 374, 29 Pac. 38.) "In order to justify the appellate court in setting aside a verdict, on the ground that it is opposed to the evidence, the evidence must be so overwhelming against the verdict as to justify the presumption that it was rendered under the influence of passion or prejudice." (*People v. Vance*, 21 Cal. 400.)

SULLIVAN, J.—The defendant, Watson M. Nesbit, Jr., was on the ninth day of August, 1894, jointly indicted with his father, Watson M. Nesbit, Sr., for the crime of grand larceny. The indictment charged that on October 5, 1893, the defendants did feloniously steal, etc., twelve twenty-dollar gold pieces, three

ten-dollar gold pieces, four five-dollar gold pieces, one $100 bank note, denominated "national currency," all United States money, and one gold English sovereign, dated 1826—all the property of William Frame. The defendants were arraigned, pleaded not guilty, and by the verdict of the jury Nesbit, Sr., was acquitted, and Nesbit, Jr., was convicted, with a recommendation of mercy to the court. The defendant Nesbit, Jr., was sentenced to two years' imprisonment in the state penitentiary. Defendant's motion for a new trial was overruled. This appeal is from the order denying a new trial and the judgment.

The facts, as they appear from the record, are substantially as follows: Watson M. Nesbit, Sr., on or about the eighth day of September, 1893, arrived at Placerville, Idaho, from Utah, and remained there over night with Thomas Mootry, Jr., and the next day went with him to Quartzburg, when said Mootry placed him in charge, as superintendent, of the mines there being operated by the Gold Hill Mining Company, the owners of which were Thomas Mootry, Jr., and David and W. A. Coughanour. Watson M. Nesbit, Jr., arrived in Quartzburg from Utah on the fourteenth day of September, 1893, and went to work for said company, under his father, as superintendent. He had charge of the cyanide plant, did assaying, etc. And it further appears that shortly after said Nesbit, Sr., was appointed superintendent of said company, several other men arrived from Utah, and went to work for said company; that the complaining witness, William Frame, had been foreman of said company for a long time prior to the said appointment of Nesbit, Sr., and was removed therefrom without his (Frame's) request or resignation. The company owned a Tilton & McFarland safe, which was situated in what is called the "old office" of the company, a new office having been built adjoining the old one, and the old one turned into an assay office. Said William Frame had, while foreman of said company, charge of said office and safe, and on the appointment of Nesbit, Sr., as superintendent, he delivered the keys of and possession of said office and safe to said Nesbit, Sr. Some time thereafter the witness Frame got the key to the safe from Nesbit, Sr., and opened the safe, and put therein the watches and rings referred to. Nesbit, Sr., placed his son (this defendant) in charge of said assay office, and gave him the key

to the safe.   On the night of the 5th of October, 1893, the safe
was robbed of a gold bar of the value of about $500, and some
amalgam, belonging to the Gold Hill Company; and it is
claimed that said Frame had in said safe, at the time of the
robbery or theft, money of the kinds and denominations above
set forth, also two watches, three finger rings, and two speci-
mens of gold quartz, all of which, it is claimed, were taken by
the robbers.   The indictment, however, only charges these de-
fendants with the theft of the money above described.   It is
shown that the morning of the 6th of October, 1893, Nesbit, Jr.,
went to the office about 7 o'clock, went in, and shortly after
came out of the office, and went directly to his father, Nesbit,
Sr., and reported to him that the office had been "looted";
whereupon they returned to the office, and found Nesbit, Jr.'s,
trunk broken open, its contents strewn about the room.   A bent
file was found lying on the floor, and some injury done to an-
other trunk, which the burglars failed to open.   Also the safe
was open, and the bar of gold and amalgam gone, and the
money and property claimed by said Frame to have been there-
in was also missing.   There were also some pieces of tin and
paper found on the floor.   Strips of the tin were fashioned some-
what after the key to said safe.   On December 8, 1893, the de-
fendants, while on their way from Quartzburg to Utah, were ar-
rested at Idaho City, and searched by the sheriff of Boise
county and his deputy.   On Nesbit, Sr., among the other things,
was found a $100 United States silver certificate or note; and
on Nesbit, Jr., was found $290 in gold coin of the United
States and an English gold coin known as a "sovereign."   Said
gold coins were found in a buckskin purse, suspended by a
string around the neck of Nesbit, Jr., and drawn up close under
his left armpit, next to the flesh.   At the same time were ar-
rested six other persons who were on their way to Utah with the
Nesbits, and who had been at work for said mining company
under the superintendency of Nesbit, Sr.   All of the parties
so arrested were released except Nesbit, Jr.   Thereafter Nes-
bit, Sr., and Nesbit, Jr., were indicted, tried for said larceny
and, as above stated, Nesbit, Sr., was acquitted, and Nesbit, Jr.,
convicted, and is now serving out the sentence imposed, in the
state's prison.

The above state of facts we think sufficient for the purposes of this decision. Several errors were assigned, and a reversal of the judgment demanded. The principal error relied on is that the verdict is contrary to law and the evidence.

As to the contention that the verdict is contrary to the evidence: The rule is well established that if the evidence is conflicting, and there is any evidence to sustain the verdict, it will not be disturbed. (*United States v. Camp,* 2 Idaho, 231, 10 Pac. 226; *People v. Ah Hop,* 1 Idaho, 698; *State v. Jorgenson,* 3 Idaho, 620, 32 Pac. 1129; *State v. O'Brien,* 3 Idaho, 374, 29 Pac. 38.) In *People v. Vance,* 21 Cal. 400, the court says: "In order to justify the appellate court in setting aside a verdict, on the ground that it is opposed to the evidence, the evidence must be so overwhelming against the verdict as to justify the presumption that it was rendered under the influence of passion or prejudice." When tested by these rules, is the verdict sustained by the evidence? There is no evidence whatever tending to identify the $100 silver certificate or note, or the gold coin of the United States—the former found on the person of Nesbit, Sr., and the latter on the person of Nesbit, Jr.—as the property alleged to have been stolen, and belonging to William Frame. The case seems to have turned on the evidence as to the identification of said English sovereign, which sovereign is before this court as an exhibit.

The said Frame, as a witness for the state, testified that he had been in the employ of the said company for some twenty years as miner and foreman, and had charge of said office, safe, etc., and had slept in said office for years prior to his discharge by Nesbit, Sr.; that he quit work on the last of September, 1893, some five days before the alleged robbery or theft; that on the first Tuesday after October 1, 1893, he went from Quartzburg to Horseshoe Bend, remained there one day, and returned home the day following, or, as we understand it, the day preceding the night of the robbery. He testified as follows: "When I left, I had some gold coin, a $100 bill, two watches, and three rings in the safe. Can't say how much coin there was. I never thought I had less than $300 in money in the safe. I did think it was about $400. It might have been $500. There were twenty-dollar, ten-dollar and five-dollar

gold pieces. I don't remember how many of each kind, but there were more twenty-dollar pieces than any, and more five-dollar pieces than ten-dollar. This was all gold coin of the United States, and the $100 bill was United States money of some kind; don't recollect what kind. I also had an English sovereign, which I took for five dollars, but did not count it in to make the even hundreds. Can't say how long I had it: think about three years. The night I got it, some other boys who were there asked me if it wasn't a King George sovereign. I didn't know, and so looked at the date, and read it that time 1826. I looked at it again, and could not tell the date, and thought perhaps I had made a mistake. I read it that time 1836. I always thought my eyesight good until I examined that sovereign here in the courtroom, and I found I could not tell the figures on it." And, further, on cross-examination, he testified as follows: "All that I know about the $100 bill that I had is that it was a $100 bill. I am pretty well satisfied that it was not a gold note. I don't know that it was not a silver bill. I testified before the probate court at the preliminary examination of one of the defendants on this charge, and, in response to a question by the prosecution, testified: 'I can't say. It looks like it. It is for the same amount, but I can't say whether it is the same one I lost or not.' I am not certain about it at all." Referring to the English sovereign, and to the time he loaned Splain some money for the company, he testified: "The time I saw the sovereign last was probably three or four days before Nesbit commenced to work there. I gave Splain the money about a week or two before Nesbit, Sr., came there. We knew he was coming at the time. I did not notice the sovereign at that time. I didn't miss it anyway. I do not know how many twenty-dollar, ten-dollar, and five-dollar gold pieces there were there then. It is an English sovereign of 1826. It has a man's head on it, represented as a curly-headed man. It is worn more on the face side than on the other. I carried it in my pocket for a long time. It appears to be a little sprung. It always felt to me like it was. The first time I saw it, thought the date was 1826; the next time, 1836; and the next time, 1886. I didn't pay much attention to it. The top looks like an '8' or a '3.' I recognized this

coin because it felt like the one I had. I think I could identify that sovereign by feeling of it once. I can yet, I guess. This coin seems sprung, has a hump on it, and feels different than an American coin. Mine felt the same way. This gold coin here [referring to United States coin] is all alike, like greenbacks, but it looks the same as the money I saw thrown on top of the documents spoken of in the safe. It looked just the same as my money did. I didn't pay much attention to the gold in the sheriff's office. I saw the sovereign when they emptied it out on the table amongst the money, and thought that it was all mine. I found the same wear and the same peculiar mark about the sovereign as the one I had, and did not notice any of the balance of the money. I did not know how much money I had in the safe; so I went at once to Mr. Splain, and asked him. He said he did not know; that Nesbit, Sr., did. I did not ask Nesbit, because he asked me how much there was, or whether I had any money there." The last statement of witness indicates that he had not informed Nesbit, Sr., that he had any money in the safe, and Nesbit, Sr., and this defendant both testify that they did not know that he had any money there.

Recurring now to the identification of the money stolen, the foregoing is all of the evidence touching the identification of the money which the defendant was convicted for stealing. The evidence utterly fails in the identification of the $100 bill as the one lost by witness Frame. Frame testified that: "I can't say. It looks like it. It is for the same amount, but I can't say whether it is the same one or not. I am not certain about it at all." And, as to the identification of United States gold coin, he testified: "This gold coin [referring to that taken from Nesbit, Jr., by the sheriff] here is all alike, like greenbacks, but it all looks the same as the money I saw thrown on top of the documents spoken of in the safe. It looked just the same as my money did." This is no identification whatever of said gold coin as being that lost by the complaining witness. It is not claimed that any of the United States gold coins had any distinguishing marks on them, but it is shown that they have not. The witness testified, they are all alike; that they looked like his money; not that they were his. A very weak attempt

was made to point out distinguishing marks on the English sovereign, and to identify it as the one claimed to have been lost by the complaining witness. The quotation from the testimony above set forth shows how utterly the prosecution failed in that attempt. The witness Frame at first attempts to identify it by testifying that "it had a man's head on it, represented as a curly-headed man," and "it is worn more on the face side than on the other," and "it appears to be a little sprung," and "it always felt to me like it was." As to the man's head on one side, that is no mark of identification, for all sovereigns of that date and issue had the same; and it is not distinguishably worn on one side more than the other, and it is not sprung, but in the usual shape of such coins. The witness testified: "I recognized this coin because it felt like the one I had. I think I could identify that sovereign by feeling of it once. This coin seems sprung. It has a hump on it, and feels different than an American coin. Mine felt the same way." Here he seeks to identify it by feeling, and signally fails. The coin has no hump on it, but it does feel different from an American coin, and the witness swears to that, but is careful not to testify that it feels different from other sovereigns of the same date and coinage, or that it contains a single distinguishing mark. Having utterly failed to identify the coin by any peculiar distinguishing marks, he undertook to identify it by the date it bore. He testified: "The first time I saw it I thought the date was 1826; the next time, 1836; the next time, 1886"; and finally admits as follows: "I didn't pay much attention to it." The said sovereign is before us. It is not perceptibly worn more on one side than on the other; it is not sprung; neither has it a hump on it different from sovereigns of that date and coinage; and it is of the date of 1826, while the testimony shows that the last time Frame read the date on his coin, prior to losing, he read it 1886. It is rather surprising that witness Frame should have so completely failed to describe the sovereign after having seen it taken from the defendant, and no doubt having carefully examined it, with a view of identifying it on the trial of this case. His eyesight and delicacy of touch or feeling must be very defective.

The possession of the gold coin is the only circumstance shown by the evidence tending to connect the defendant with the larceny charged, and the prosecution failed to identify said coin as that alleged to have been stolen. If the prosecution had identified said coins as the ones stolen, or had proved that defendant had no money prior to the theft, either would have been a strong circumstance of defendant's guilt, and would have placed upon him the necessity of showing that he came into the possession of said coins innocently. But, as there was a complete failure to identify the coins as those alleged to have been stolen, the jury should have returned a verdict of not guilty. The defendant must have been convicted on suspicion, as there was no legal evidence establishing his guilt, regardless of the utter want of evidence on behalf of the prosecution attempting to identify the coin.

The defendant testified in his own behalf that he brought said gold coin from Utah, and also from whence he got it; that he had carried money several times as he was carrying that when arrested by the sheriff; that he was on his way to Utah, and carried it thus for safety; that he had a small collection of old coins; and that he had had said sovereign for more than three years—and is corroborated as to these facts by his father, sister, two brothers, his betrothed, and by the two other witnesses not related to him. In regard to the $100 bill, Nesbit, Sr., testified as to circumstance and date of his drawing $1,900 out of the Deseret National Bank at Salt Lake City, Utah, and that the $100 bill was a part of that money, and is corroborated as to those facts by one witness.

Conceding that there is circumstantial evidence against the defendant tending to establish his guilt, those circumstances can be and are as reasonably explained on other hypotheses than that of defendant's guilt, or as perfectly consistent with defendant's innocence, and for that reason a new trial should have been granted. But, in our view of the case, there is no evidence to sustain the verdict; and as the record shows that Frame is the only witness who could identify the money alleged to have been stolen, and his testimony is full and complete of all he knew in that regard, it would only result in an acquittal of defendant if a new trial should be ordered,

and also in a great expense to the county without any beneficial result. A new trial will not be ordered for those reasons. It is not necessary for us to pass upon the other errors assigned.

The judgment of the district court is reversed, and it is ordered that the defendant be discharged, and that the exhibit consisting of United States gold coin and said English sovereign be delivered by the clerk of this court to the defendant or his attorneys, and that order for release of defendant and remittitur issue at once.

Morgan, C. J., and Huston, J., concur.