(January 21, 1904.)

## STATE v. LEVY.

[75 Pac. 227.]

INSUFFICIENCY OF EVIDENCE—CIRCUMSTANTIAL EVIDENCE—REASONABLE
DOUBT—WEIGHT OF EVIDENCE—INSTRUCTIONS—JURY ATTENDING
THEATER—WITNESS—REWARD—COMPETENCY OF JUROR—NEW TRIAL.

1. Evidence considered and held sufficient to sustain the verdict
of the jury.

2. The convincing effect that follows from positive evidence is
not necessarily expected to follow from circumstantial evidence,
although the latter kind of evidence is often the most satisfactory
and convincing that can be produced.

3. It is a strong circumstance which the jury ought to consider
if it is shown to their satisfaction and beyond a reasonable doubt
that the accused had a strong, impelling motive to commit the
crime with which he is charged.

4. To authorize a conviction on circumstantial evidence, alone,
the facts and circumstances shown by the evidence must be incom-
patable, upon any reasonable hypothesis, with the innocence of the
accused and incapable of explanation upon any reasonable hypothe-
sis or rational conclusion other than that of the guilt of the ac-
cused.

5. A reasonable doubt is a fair doubt arising from all of the
evidence. It is not a mere imaginary, captious or possible doubt,
but a fair doubt based upon reason and common sense.

6. The admission of certain evidence of the diseased condition of
one of the women with whom the accused was living, held not preju-
dicial error.

7. The jury is the judge of the weight to be given to the tes-
timony of the witnesses, and this court will not interfere, unless
it is clearly shown that the verdict resulted from prejudice or
passion, or is clearly against the evidence.

8. It is not error for the court, on its own motion, to instruct
the jury that the neglect or refusal of the defendant to testify
in his own behalf shall in no manner prejudice him, nor be used
against him on the trial.

9. With the permission of the court the jurors were taken to a
theater, and six jurors were placed in one open box and six in an-
other, each six with a sworn officer, and in sight of each other, and
the play had no reference whatever to the trial. Held, not a suffi-
cient cause for granting a new trial.

10. That a witness, in a capital case, received a part of the reward offered for the conviction of one who committed the crime is not of itself a cause for granting a new trial.

11. Where the credit or veracity of a juror is attacked on the ground that he had sworn falsely on his *voir dire*, it is not error for the judge to consider affidavits sustaining the character of such juror.

12. Newly discovered evidence examined and *held* not sufficient to warrant the granting of a new trial.

(Syllabus by the court.)

AILSHIE, J., dissenting in part and as to conclusions reached.

APPEAL from District Court of Ada County. Honorable George H. Stewart, Judge.

Defendant was convicted of murder in the first degree, and judgment of death entered against him. Affirmed.

The facts are fully set forth in the opinion.

Alfred A. Fraser and N. M. Ruick, for Appellant.

That the evidence was insufficient to justify or sustain the verdict of the jury in this case will be conclusively shown to the court by the reading of the transcript of the evidence given upon the trial; and from reading and considering the same, the court can only arrive at the conclusion that the verdict in this case was the result of the prejudice of the jury against the defendant on account of his immoral habits and method of living. The evidence falls far short of the legal standard which requires (especially in cases of circumstantial evidence) that the defendant can only be convicted when the evidence established to a moral certainty and beyond a reasonable doubt the guilt of the defendant. And in cases of circumstantial evidence, the law requires, before a conviction shall be had, that the circumstances shall not only all be consistent with the theory of the guilt of the defendant, but absolutely inconsistent with the theory of his innocence. In cases of this character where the evidence is entirely circumstantial, the appellate court will reverse a judgment of conviction where, from an examination of

the record, the court is satisfied that the evidence is insufficient
to sustain a verdict and does not amount to that degree of proof
which is legally required before a defendant can be convicted.
(*State v. Fry,* 40 Kan. 311, 19 Pac. 742; *People v. Bowers,* 79
Cal. 415, 21 Pac. 752; *Lind v. Closs,* 88 Cal. 6, 25 Pac. 972;
*State v. Primm,* 98 Mo. 368, 11 S. W. 732; *Spoon v. Railroad
Co.,* 87 Mo. 74; *Whitsett v. Ranson,* 79 Mo. 258; *Baker v.
Stonebraker,* 36 Mo. 345; *Price v. Evans,* 49 Mo. 396; *Garrett
v. Greenwell,* 92 Mo. 120, 4 S. W. 441; *State v. Mansfield,* 41
Mo. 470; *State v. Daubert,* 42 Mo. 239; *State v. Brosius,* 39
Mo. 534; *State v. Jaeger,* 66 Mo. 173; *State v. Castor,* 93 Mo.
242, 5 S. W. 906.)    Where the evidence leaves the defendant's
guilt in doubt, a new trial should be granted, as contrary to
evidence. (*Reynolds v. State,* 24 Ga. 427; *Rafferty v. People,*
72 Ill. 37; *Stout v. State,* 78 Ind. 492; *State v. Milton,* 22
Iowa, 241; *Crandall v. State,* 28 Ohio St. 479; *State v. Kane,*
1 McCord, 482; *Owens v. State,* 35 Tex. 361; *Brite v. State,* 10
Tex. App. 368; *Ellis v. State,* 10 Tex. App. 540; *Saltillo v.
State,* 16 Tex. App. 249; *Dean v. Commonwealth,* 32 Gratt.
912.)    In a criminal case a new trial will be granted when the
evidence preponderates against the verdict. (*Territory v.
Reuss,* 5 Mont. 605, 5 Pac. 885; *Leake v. State,* 29 Tenn. (10
Humph.) 144.)   "A new trial will be granted where a con-
viction is had on evidence not connecting defendant with the
crime beyond a reasonable doubt." (*Williams v. State,* 85 Ga.
535, 11 S. E. 859; *Green v. State,* 12 Tex. App. 51.)   The
court erred in not granting a new trial, for the reason that the
affidavits on file disclosed the fact that Juror Mathews was dis-
qualified to act as a juror in the case. (*People v. Plummer,* 9
Cal. 298; *Busick v. State,* 19 Ohio, 198; *State v. Cleary,* 40 Kan.
287, 19 Pac. 776; *Sam v. State,* 31 Miss. 480; *Achley v. State,*
64 Ind. 56; *Jewell v. Jewell,* 84 Me. 304, 24 Atl. 858, 18 L.
R. A. 473; *Long v. State,* 56 Ind. 182, 26 Am. Rep. 19; *Com-
monwealth v. Scott,* 123 Mass. 239, 25 Am. Rep. 87.)   It is
a good ground for a new trial when a juror on his *voir dire*
has stated that he has neither formed nor expressed an opinion
as to the guilt or innocence of the accused, if it comes to the
knowledge of the latter after verdict that such juror had pre-

judiced the case, and that· fact is made to appear to the satis-
faction of the court. (*State v. Shelledy,* 8 Iowa (8 Clark),
447; *State v. Burnside,* 37 Mo. 343; *State v. Gonce,* 87 Mo.
627; *Willis v. People,* 32 N. Y. 715; *Fitzgerald v. People,* 1
Colo. 56; *McGuffey v. State,* 17 Ga. 497; *Cody v. State,* 4 Miss.
27; *State v. Taylor,* 67 Mo. 358; *United States v. Upham,* 2
Mont. 170; *Hanks v. State,* 21 Tex. 526; ·*Washburn v. State,*
31 Tex. Cr. Rep. 352, 20 S. W. 715.) The court erred in giv-
ing to the jury of its own motion instruction No. 28, as fol-
lows, to wit: "A defendant in a criminal action or proceeding
to which he is a party is not, without his consent, a competent
witness for or against himself. His neglect or refusal to give
such consent shall not in any manner prejudice him nor be
used against him on the trial or proceeding." (*Wilson v. United
States,* 149 U. S. 60, 13 Sup. Ct. Rep. 765, 37 L. ed. 650.)
The fact that the accused declines to testify in his own behalf
cannot be commented on. (*United States v. Snyder* (C. C.),
14 Fed. 554; *People v. Tyler,* 36 Cal. 522; *People v. Brown,* 53
Cal. 66; *Jackson v. People,* 18 Ill. App. (18 Bradw.) 508;
*Long v. State,* 56 Ind. 182, 26 Am. Rep. 19; *State v. Graham,*
62 Iowa, 108, 17 N. W. 192; *State v. Balch,* 31 Kan. 465, 2
Pac. 609; *State v. Tennyson,* 42 Kan. 330, 22 Pac. 429; *Com-
monwealth v. Scott,* 123 Mass. 239, 25 Am. Rep. 87; *State v.
Martin,* 74 Mo. 547; *People v. Doyle,* 58 Hun, 535, 12· N. Y.
Supp. 836; *Hunt v. State,* 28 Tex. App. 149, 19 Am. St. Rep.
815, 12 S. W. 737; *McPherson v. State* (Tex. App.), 15
S. W. 174; *Johnson v. State,* 31 Tex. Cr. Rep. 464, 20 S.
W. 980; *Richardson v. State,* 33 Tex. Cr. Rep. 518, 27 S. W.
139; *State v. Cameron,* 40 Vt. 555; *Price v. Common-
wealth,* 77 Va. 593; *Baker v. People,* 105 Ill. 452.) A remark
by the district attorney, in his argument, that the law permits
defendants to testify, is ground for reversal. (*McDonald v.
People,* 126 Ill. 150, 9 Am. St. Rep. 547, 18 N. E. 817; *Shole-
water v. State,* 84 Ind. 562; *Coleman v. State,* 111 Ind. 563,
13 N. E. 100; *State v. Ryan,* 70 Iowa, 154, 30 N. W. 397; *State
v. Holmes,* 65 Minn. 230, 68 N. W. 11; *State v. Weddington,*
103 N. C. 364, 9 S. E. 577; *Jordan v. State,* 29 Tex. App. 595,
16 S. W. 543; 1 Bishop's Criminal Procedure, sec. 1186.) The

.defendant in this case should have been granted a new trial by reason of the acts and conduct of the deputy sheriff of Ada county and chief of police of Boise City in influencing, inducing, and in some instances coercing witnesses in testifying in this case for the prosecution. The following document executed to the witness Ragland, who testified for the prosecution, which was presented to the trial court on motion for a new trial herein, and which was admitted to be genuine and admits of no explanation, and is of such an infamous nature, should have, of itself, been sufficient to impel the trial judge to have immediately granted a new trial in the interest of justice and decency. The document is as follows:

"DEPARTMENT OF POLICE.
　　　"B. F. Francis, Chief.
　　　　　　　　"Boise, Idaho, Feb. 22, 1902.
　　"This is to certify that we, the undersigned, agree to pay to J. L. Ragland, or order, the sum of fifty dollars out of any reward we may receive from either the state of Idaho or the heirs of Davis Levy.
　　　　　'(Signed)　　　"B. F. FRANCIS,
　　　　　　　　　　　　"A. ROBINSON."

　　John A. Bagley, Attorney General, and Hawley & Puckett, for the State.

　　The credibility of witnesses and the probative force of facts introduced are the sole province of the jury. (*Hicks v. Sumpter,* 39 S. C. 39, 17 S. E. 509; *State v. Ashworth,* 43 La. Ann. 204, 6 South. 625; *State v. Nelson,* 32 La. Ann. 842.) In reviewing a cause, an appellate court cannot weigh the evidence. The only question before the court is, whether there is any legal evidence to sustain each point in the case. (*People v. Chew Sing Wing,* 88 Cal. 268, 25 Pac. 1099; *Willamette etc. Co. v. Kremer,* 94 Cal. 205, 29 Pac. 633; *San Gabriel Wine Co. v. Behlow,* 94 Cal. 110, 29 Pac. 419; *Welch v. Mohr,* 93 Cal. 371, 28 Pac. 1060; 2 Am. & Eng. Ency. of Pl. & Pr. 391, 400, and cases cited; *Chamberlain v. Woodin,* 2 Idaho, 642 (609),

23 Pac. 177; *O'Connor v. Langdon,* 3 Idaho, 61 (2 Idaho, 803), 26 Pac. 659; *People v. S. H. Hop,* 1 Idaho, 698; *State v. O'Brien,* 3 Idaho, 374 (2 Idaho, 1094), 29 Pac. 38; *United States v. Camp,* 2 Idaho, 231 (815), 10 Pac. 226; *People v. Nagle* (Cal.), 29 Pac. 640.)   A judgment of conviction will not be reversed unless the verdict is against the clear weight of evidence, or shows a corrupt or arbitrary motive. (*People v. Fish,* 125 N. Y. 136, 26 N. E. 319; *State v. Haverly,* 4 Idaho, 484, 42 Pac. 506; *People v. Hong Quinn Moon,* 92 Cal. 41, 27 Pac. 1096; *People v. Nelson,* 85 Cal. 421, 24 Pac. 1006; *Commonwealth v. Jacobs,* 152 Mass. 276, 25 N. E. 463; *Commonwealth v. Ryan,* 152 Mass. 283, 25 N. E. 465.)   It is the peculiar province of the jury to weigh the evidence and decide upon the credibility of the witnesses, and it is not the province of the court to disturb verdicts on this ground unless there is either a total deficiency in the evidence, or it preponderates so greatly against the verdict as to render it clear that the jury must have been under the influence of passion or prejudice. (*People v. Manning,* 48 Cal. 355; *People v. Mayes,* 66 Cal. 597, 26 Am. Rep. 126, 6 Pac. 691; *People v. Ah Jake,* 91 Cal. 98, 27 Pac. 595; *People v. Freeman,* 92 Cal. 359, 28 Pac. 261; *People v. Sullivan,* 129 Cal. 557, 62 Pac. 101.)   The last point by appellant is that the Juror Mathews was incompetent to sit as a juryman and that affidavits as to his good character filed in the motion for a new trial were inadmissible.   Several affidavits were filed showing he had spoken in harsh language of the defendant prior to the trial, and expressed himself as to his guilt.   Mr. Mathews, in his counter-affidavit, positively denies this, and seventeen prominent citizens have filed affidavits showing his good reputation for truth and veracity.   Appellant claims such affidavits cannot be considered by the court.   The fact that a juror, after trial, is found to have formed or expressed an opinion before going on the jury is, we contend, not a ground for new trial in this state.   It is not misconduct of the jury, and that is the only head it could come under to be a ground for new trial. (Idaho Rev. Stats., sec. 7952; *People v. Farr,* 43 Cal. 137; *People v. Mortimer,* 46 Cal. 121; *People v. Samuels,* 66 Cal. 99, 4 Pac.

1061; *State v. Gile,* 8 Wash. 12, 35 Pac. 417; *Stale v. Marks,* 15 Nev. 33; *Black v. Territory,* 3 Wyo. 313, 22 Pac. 1090; *State v. Peterson,* 38 Kan. 204, 16 Pac. 264; *Hughes v. People,* 116 Ill. 330, 6 N. E. 55; *State v. Brooks,* 92 Mo. 542, 5 S. W. 257; *Burgess v. Territory,* 8 Mont. 57, 19 Pac. 558.) The appellant complains of the action of the court in giving the following instruction, to wit: "A defendant in a criminal action or proceeding—'to which he is a party,' is not, without his consent, a competent witness for or against himself. His neglect or refusal to give such consent shall not in any manner prejudice him nor be used against him on the trial or proceeding." This is the law of this state. (Rev. Stats., sec. 8143.) The defendant did not testify in this case, and it was proper for the court to instruct the jury as to the law in such cases. This instruction was given by the court for the sole purpose of protecting the defendant, thereby preventing any presumption from arising in the minds of the jury from the defendant's silence, which otherwise was very apt to arise. It is contended that there was misconduct by the jury and the officers having them in charge in attending a theater during two evenings while the trial was in progress, and being seated six on one side of the building and six on the other in private boxes, and each party in charge of a sworn officer. This is not misconduct or separation as defined by statute. (*People v. Bemmerly,* 98 Cal. 299, 33 Pac. 263; *People v. Bush,* 68 Cal. 623, 10 Pac. 169; *Key v. State,* 28 Ark. 155; *Territory v. King,* 6 Dak. 131, 50 N. W. 623; *Territory v. Hart,* 7 Mont. 489, 17 Pac. 718.)

SULLIVAN, C. J.—On February 20, 1902, the defendant was convicted of the crime of murder in the first degree for the killing of one Davis Levy. By information of the county attorney of Ada county, the defendant was accused of said crime, in that, on the third day of October, 1901, at the county of Ada, in the state of Idaho, the said defendant did feloniously and of his deliberate, premeditated malice aforethought, kill and murder said Davis Levy by means of a rope, and beating, bruising and strangling said deceased. After the verdict aforesaid was rendered the court passed the sentence of death upon

the defendant. Thereafter counsel for the defendant moved for a new trial, which was heard upon a bill of exceptions and certain affidavits, by which it was claimed that one of the jurors held and expressed an opinion of the defendant's guilt prior to his having been accepted as a juror, and on the ground of newly discovered evidence. The motion for a new trial was denied by the court, and this appeal is from the judgment and the order denying the new trial. Numerous errors are assigned as ground for granting a new trial which go to the admission and rejection of certain evidence and the insufficiency of the evidence to support the verdict and error in giving certain instructions to the jury. Counsel also contend that a new trial should be granted upon the ground of the newly discovered evidence set forth in certain affidavits used on the motion for new trial. Counsel for the defendant contend with great zeal and ability that the evidence was insufficient to sustain the verdict of the jury. The evidence was mostly circumstantial, and among the mass of evidence admitted on the trial the following facts appear:

The deceased was the owner of a brick building, situated on Main street, between 6th and 7th streets, in Boise City, the second story of which was occupied as a lodging-house, in one room of which deceased had his office, living and sleeping therein. Upon the back part of the lots upon which the building stands there were situated several small houses, commonly known as "cribs," which "cribs" were occupied by "women of the town"; said "cribs" faced on the alley between Main and Idaho streets. The defendant had two of these unfortunate women under his protection, and, as the evidence would show, under his control. They, like himself, were of French origin. For some months prior to the death of Levy the defendant's women had occupied one of those "cribs" in the night-time, living in the daytime with defendant, on Bannock street, several blocks distant from said "cribs." The main entrance to the deceased's building aforesaid was and is on Main street, and from that entrance a person could go upstairs, pass the said office of the deceased through a hallway to the back door, from which door stairs reached below to the back part of the lots on

which said building stood. An arch of brick stood on the back
of the lots next to the alley. The "crib" occupied by the de-
fendant and his said women was alongside of said arch. A per-
son could pass up the stairway from Main street, pass the said
office of deceased, and go through the building down the said
back stairs and through the archway into the alley. At the
time of the murder, a colored woman occupied one of the "cribs"
near said archway, which "crib" has a back entrance, into the
yard back of the main building. It is shown that Davis Levy
was an eccentric, excitable man of about seventy years of age,
and the defendant comparatively a young man. It appears from
the record that the defendant and his women had removed from
said "crib" on the second day of October, the day preceding
the murder of the deceased, and was making preparations to go
with his women to Baker City, in the state of Oregon. It also
appears that the defendant had occupied a room in said lodging-
house for some months during the year or two previous to the
date of the homicide, and that he and the women had occupied
the "crib" referred to for months prior to the date of the homi-
cide. The evidence shows that there was a very hostile and
bitter feeling between the defendant and the deceased. It is
shown that as early as May, 1901, they had a fight, and the de-
fendant struck the deceased with a piece of board. The evi-
dence discloses numerous threats by the defendant against the
deceased, in some of which he had declared he would kill the
deceased—said that he would cut his throat; that he would cut
his neck off at his shoulders. It is shown that on October 2,
1901—that being the day prior to the day of the homicide of
the deceased—the defendant moved from said "crib." It ap-
pears that he was compelled to do this by one of the police offi-
cers of the city, because one of his said women was unable to
obtain a doctor's certificate of good health, which it seems was
required by that class of women. The evidence indicated that
the defendant was greatly incensed at this and he said on that
day that Davis Levy, the deceased, had run him out and that he
would get even with him, and on the same day he threatened
the deceased in the presence of another witness, apparently
charging the deceased with having been the cause of his being

compelled to leave the city. There is much other evidence which tends to show the malicious feeling of the defendant toward the deceased. It is shown that some months prior to October 3, 1901, the defendant was skinning a live rabbit and a person present protested against such cruelty, and the defendant replied that he would skin Levy (the deceased) that way. This evidence was evidently introduced to show the malice and hatred of the defendant toward the deceased.

The evidence shows that the body of the deceased was found on October 5, 1901, in one of the rooms of the said lodging-house. He had been gagged, a rope tightly drawn around his neck, tight enough to cause strangulation; his hands and feet were tied. The appearance of his said office, which he used as a living and sleeping room, and a wound on the left side of his head, indicated that he had been struck down while eating his evening meal, and that he had been taken to the room where the body was found, which was one of the lodging-rooms in said house. There was no evidence of a struggle in the latter room. When found, the body was dressed and lying on the bed, and several keys and two tobacco or money sacks and some other articles were found laid alongside of the body, on the bed, in regular order. His shoes had been taken off and placed near the foot of the bed; a gag made of a knotted napkin was in his mouth and a towel and pillow laid over his face. There was no indication of a struggle after the body had been placed on the bed. There was no money found on his person, but two checks were found under the bedclothing on the opposite side of the bed from the body. In his said office or living-room, was found on the table a bowl of broth, part of a loaf of barley bread, a piece of which had been cut off and a mouthful bitten out of the piece; also some butter and cheese were on the table. A kettle containing some small pieces of meat was on the stove. So far as the evidence shows, the deceased was last seen between half after 6 and 7 o'clock on the evening of October 3, 1901, and the evidence shows that if deceased had been living for any length of time after 7 o'clock, he would have been seen. It is shown that a piece of board used to bar the door to the front entrance of said lodging-house, which was usually left in

the hall by Levy when he went to bed at night, was not there that night, and the light that deceased kept at the front door was not lit that night, nor was the back door locked. This and other circumstances would go to prove that the deceased was killed before his retiring time and while at supper. Taking all the evidence, it is clear to us that the deceased was killed between 7 and 8 o'clock on the evening of October 3, 1901. The circumstances also show that he must have been killed by someone familiar with the premises. It appears that said office of deceased was locked and found so at the time the body was discovered. A key that would unlock said office was found in a refuse box back of the "crib" which had been occupied by the women of the defendant, and also some small pieces of rope like that found around the neck, arms and legs of the deceased.

The defense of the defendant was an *alibi,* and much of the evidence tends to show the malice and ill-will of the defendant toward the deceased, and of the defendant's whereabouts from 7 o'clock until half after 10 o'clock on the evening of October 3, 1901.

Counsel for appellant contend that the defendant has clearly established an *alibi* in that the evidence shows the whereabouts of defendant during said time, and that it would have been impossible for him to have murdered the deceased, while it is contended by counsel for the state that the evidence clearly shows that the defendant was around and in the said lodging-house at least two or three times during that period. One of the witnesses for the state testified that she saw the defendant standing in said brick archway back of the lodging-house and afterward disappear into the rear of said "crib" where said trash-box was situated. He was seen by another witness going out of said archway at about half-past 7 o'clock, and was seen in the alley near there by two other witnesses between 7 and 8 o'clock. The evidence further shows that about fifteen or twenty minutes before 8 o'clock on that evening the defendant appeared at the barber-shop opposite Weil's cigar store on Main street, between 7th and 8th streets, in Boise, and went to the back part of the shop and asked for a bath; he went into the bathroom, remained there some fifteen or twenty minutes,

came out and asked for a quick shave. The barber who shaved
him was at that time busy with another customer, and the de-
fendant sat down and waited a few minutes for his turn. It
is also shown that it was the custom of the defendant to get
shaved twice a week, and that he had been shaved the day be-
fore. It is the custom to close all barber-shops in Boise
promptly at 8 o'clock. It appears that the curtains were drawn
in said shop and the door locked before the defendant was
shaved. After the defendant was shaved the barber unlocked
the door and let him out, and the barber immediately went
across the street to Weil's cigar store and began to play a game
of cards known as "solo" with two other persons and continued
to play for about half an hour, when the defendant came into
the room. The barber testified that the defendant acted in a
very strange and unusual manner and seemingly was laboring
under considerable excitement. The defendant remained there
watching the game until he was notified that the busses were
going to the hotels to take passengers to the depot, to take the
10:40 train; upon said announcement being made the defendant
left. The evidence shows that the busses go to the hotels for
passengers for the 10:40 train at 10 o'clock. It appears that
the defendant left Weil's cigar store at about 10 o'clock and ar-
rived at the depot about 10:25 or 10:30 o'clock and appeared
to be laboring under some excitement, and was perspiring; it
also appears that it takes less than five minutes to walk from
Weil's cigar store to the depot. The evidence shows that the
electric lights in Boise went out on said night of October 3d
about twenty-five minutes after 10 o'clock; and one of the
witnesses for the state testified that shortly before those lights
went out she saw the defendant come down the back stairs of
said lodging-house and at the bottom of the stairs saw him pull
out his watch and put it back in his pocket, then walked to said
archway and stood there looking up and down the alley; he
then went down back of said "crib" that his women had oc-
cupied, and that just as he disappeared the electric lights went
out. Another witness for the state testified that between 10
and 11 o'clock on the night of October 3d he was playing
billiards in his saloon on the north side of Main street, between

7th and 8th streets, and that defendant came in the back entrance—that being the entrance from the alleyway. Another witness testified that he was in said saloon when the defendant came in there; that defendant seemed to be in a hurry and was sweating and perspiring considerably; that the first witness above referred to spoke to the defendant and wanted to know what was the matter, he was sweating so. He put his hand on his stomach and said, "I am sick." While one of the witnesses referred to is not sure of the time when defendant came into said saloon, it clearly appears from the other witness that it was between 10 and 11 o'clock on the evening of October 3d.

There are many other circumstances tending to prove the guilt of the defendant, none of which are contradicted or disproved, and it is not necessary for us to relate them here. But from all of the evidence in the case, which we have carefully considered, we have no doubt of its sufficiency to sustain the verdict.

The test of the sufficiency of circumstantial evidence is: Does the circumstantial evidence produced on the trial establish in the minds of the jury a sense of conviction to the exclusion of all reasonable doubt? The convincing effect that would follow from positive evidence is not necessarily to flow from circumstantial evidence, although circumstantial evidence is often the most satisfactory and convincing that can be produced. (3 Rice on Evidence, sec. 343, and authorities there cited.)

It is a general axiom of human action that all persons act from motive, and it is always a satisfactory circumstance if a jury can feel that it is proved to their satisfaction that the defendant had a motive, a strong, impelling motive for the act which he is charged with having committed. (3 Rice on Evidence, sec. 344.)

In the case at bar it is clearly established by the evidence that the defendant had a strong, impelling motive to commit the crime of which he was convicted. The ill-will, hatred and malice of the defendant toward the deceased is shown all through the evidence. That being clearly shown, and the conduct, actions, appearance and whereabouts of the defendant as shown by the evidence between the hours of 7 o'clock and 10:30 o'clock

on the evening of October 3, 1901, taken into consideration with all the evidence in the case, are amply sufficient to establish in the minds of the jury the guilt of the defendant to the exclusion of all reasonable doubt.

It is contended that the evidence, all taken together, is reasonably and fairly consistent with the hypothesis of the innocence of the defendant, and for that reason it is insufficient to sustain the verdict of guilty. We cannot agree with counsel in that contention, for as we view the evidence no other reasonable hypothesis than that of the guilt of the defendant can be drawn from it. The facts and circumstances shown by the evidence are absolutely incompatible upon any reasonable hypothesis with the innocence of the accused, and incapable of explanation upon any reasonable hypothesis or rational conclusion other than that of the guilt of the defendant. The evidence is sufficient to establish the guilt of the accused beyond a "reasonable doubt." The term "reasonable doubt," as defined by text-writers and decisions of courts of last resort, is a "fair" doubt growing out of the testimony in the case. It is not a mere imaginary, captious or possible doubt, but a "fair doubt" based upon reason and common sense. (3 Rice on Evidence, sec. 268.) It would be possible to raise an imaginary or captious doubt in any case, no matter how strong, direct and positive the evidence might be. For instance, a jury might imagine, in a case where two uncontradicted eye-witnesses to a crime testified to its commission, that such witnesses might be mistaken and thus entertain a captious or imaginary doubt. But such a doubt is not a "reasonable doubt" within the legal definition of that phrase.

The admission of evidence to show that one of the defendant's women had the syphilis and was for that reason unable to get a health certificate from the city physician and prohibited from plying her vocation in Boise City, is assigned as error. It appears from the record that defendant claimed, and had stated, that the deceased was the cause of his having to leave the city, and as we understand it, the evidence last referred to was introduced to show that the deceased had nothing to do with that matter; that the examination of said female was suggested to the physician by a policeman, and that deceased had nothing to do with it.

Considering all the evidence in the case which shows the character and vocation of the defendant and the women with whom he was living, and which it would have been impossible to have excluded on the trial, the admission of that evidence was an immaterial error which could not have possibly affected the verdict of the jury, and hence did not affect any substantial right of the defendant. (See Rev. Stats., sec. 8236.)

It is suggested that many of the witnesses for the state were from the slums of the city, and for that reason their testimony was unworthy of credence. But it must be remembered that the jurors are the judges of the weight to be given to the testimony of the witnesses, and having seen the witnesses and heard them testify this court is not authorized to say that they should have rejected the testimony of any witness. If the testimony of all witnesses of the character of those referred to must be rejected on principle, many criminals would go unwhipped of justice. The rule is well established that the weight to be given to the testimony of the witnesses is the exclusive province of the jury, and in the case at bar it was for the jury to determine whether the entire evidence established the guilt of the defendant beyond a reasonable doubt. There is nothing in the record to indicate that the verdict was the result of passion or prejudice. The evidence, in our opinion, shows the guilt of the defendant beyond a reasonable doubt.

In *State v. O'Brien,* 3 Idaho, 374, 29 Pac. 38, this court said: "The jury saw all the witnesses upon the stand and could judge of their truthfulness. They were carefully and fully instructed in the law by the court. The judge who tried the cause, also, doubtless carefully noted the testimony, and certainly would not permit a judgment of this kind to stand if there was reasonable doubt of guilt."

The giving of the following instruction on the court's own motion, is assigned as error, to wit: "A defendant in a criminal action or proceeding to which he is a party is not, without his consent, a competent witness for or against himself. His neglect or refusal to give such consent shall not in any manner prejudice him nor be used against him on the trial or proceeding."

Section 8143, Revised Statutes, is as follows: "A defendant in a criminal action or proceeding to which he is a party is not, without his consent, a competent witness for or against himself. His neglect or refusal to give such consent shall not in any manner prejudice him nor be used against him on the trial or proceeding."

That statute was enacted for the protection of the accused, and numerous authorities could be cited where causes have been reversed because of comments made by the prosecuting attorney, and some instances by the court to the jury on the failure of the accused to testify in his own behalf. That statute provides that such failure shall not in any manner prejudice the accused nor be used against him on the trial.

The instruction complained of was given for the sole purpose of protecting the defendant and preventing any presumption from arising in the minds of the jury because of the failure of defendant to testify in his own behalf. It would be most natural for the jury to revert to the fact that the defendant failed to testify in his own behalf, and one can be hardly so simple as to imagine that the jurors would not comment or think of that fact had the court not given the instruction complained of.

In support of said contention counsel cite *Wilson v. United States,* 149 U. S. 60, 13 Sup. Ct. Rep. 765, 37 L. ed. 650. That was a case where the district attorney commented on the failure of the accused to testify in his own behalf, and the same is true of *McKnight v. United States,* 115 Fed. 975, 54 C. C. A. 358. Numerous authorities have been cited on the proposition that the fact that the accused declined to testify in his own behalf cannot be commented on. But not one case has been called to our attention where the giving of the instruction complained of was held to be error.

The giving of several other instructions is assigned as error. After an examination of them we conclude that the instructions complained of correctly state the law and the court did not err in giving them. It appears from the officers in charge of the jury that during the trial the jurors expressed a desire to go to

the theater to witness certain plays on two evenings; that the
court called respective counsel's attention to that fact and
asked the counsel in open court whether they had any objec-
tion thereto, and the attorneys assented, and the jurors at-
tended said theater two evenings. It is shown that upon each
of said occasions the jurors were taken into said theater after
the rest of the audience were seated; that six of said jurors
were seated in one box and six in another, facing each other,
and an officer with each six; that no other person entered either
of said boxes or spoke to either of said jurors; that each of said
officers was in plain sight of the entire jury; that said jurors
remained in said boxes until the audience had departed and
then said jurors were taken from said boxes to the juryroom;
that there was nothing in either play that in any manner could
affect the judgment or opinion of any member of the jury in
regard to this case. Such action of the jury is assigned as er-
ror. Counsel for defendant each made an affidavit in which
they stated that they had no knowledge or recollection of the
judge calling their attention to the fact that said jurors de-
sired to attend the theater, and had not given their consent
thereto.

While this court does not sanction the practice of jurors at-
tending theaters during the progress of a murder trial, we do
not think a new trial should be granted on that ground, unless
it is shown that some substantial right of the accused has been
prejudiced thereby, which has not been done in this case. The
misconduct or separation of the jury complained of in this case
does not come within the provisions of section 7952, Revised
Statutes. (See, also, *People v. Bemmerly,* 98 Cal. 299, 33
Pac. 263; *People v. Bush,* 68 Cal. 623, 10 Pac. 169.)

It is contended that defendant is entitled to a new trial be-
cause of the misconduct of the officers, in that they were very
diligent and zealous in their efforts to discover the person who
committed the homicide; that a large reward was offered for
the conviction of the murderer; that the officers promised to
pay at least one witness $50 in case they received the reward.
That witness was the barber who shaved the accused on the

night of the murder, and his testimony was corroborated by other witnesses. The fact that a reward was offered and that some of the witnesses and officers were to receive a part of it in case of conviction is not sufficient cause to warrant the granting of a new trial, and the court did not err in refusing to grant a new trial on the facts presented in the transcript in that regard.

Several affidavits were presented on the hearing of the motion for a new trial, in which the affiants swore that one of the jurors had before the trial said, referring to the defendant, "They have got the right man and I believe he ought to be hung on general principles anyway," and other statements equivalent thereto, and had made remarks derogatory to the defendant. The judge on the hearing of said motion admitted the affidavit of the juror denying that he had ever made such statements and also affidavits of seventeen persons, neighbors and acquaintances of said juror, to the effect that they had known said juror for years and knew his general reputation, in the vicinity in which he lived, for truth, veracity, honesty and integrity, and that it was good. It is contended that the admission of the last named affidavits was error, and counsel cite on that point several authorities that apply to witnesses. In the case at bar the accused did try to show that the reputation of said juror for truth and veracity was bad by attempting to show that on his *voir dire* he had sworn that he had not formed or expressed an opinion of the guilt of the defendant when in fact he had formed, and at several different times had expressed, such opinions. The truth and veracity of the juror was directly put in issue and directly attacked. The question of the incompetency of said juror was presented to the court or judge on motion for a new trial, and we do not think that the court erred in considering said sustaining affidavits. The judge in his discretion had the right to admit any evidence tending to throw any light on the question. The practice of admitting sustaining affidavits was in such cases apparently sanctioned by this court in *State v. Davis,* 6 Idaho, 59, 53 Pac. 678. Referring to that question the court said: "While we think such action is largely a matter of discretion on the part

of the trial court, etc., it is not necessary to decide the correctness of the action of the trial court in receiving and considering such rebutting affidavits."

We do not question the rule that sustaining evidence cannot be introduced to support the character of a witness for truth and veracity when his character has not been attacked. But in the case at bar the character of the juror was directly attacked.

We have examined the newly discovered evidence on which counsel for defendant relies for a new trial, and do not think it sufficient to warrant the granting of a new trial. It is shown by the affidavit of one witness that he found human blood stains on the knob of the door of one of the rooms of said lodging-house and on the water pitcher in said room, but that was not sufficient evidence on which to grant a new trial.

We have examined the many errors assigned in this case and are fully convinced that the trial court did not err in denying a new trial.

The judgment is affirmed and the cause remanded for further proceedings herein as provided by law.

Stockslager, J., concurs.

Ailshie, J., dissenting in part and to the conclusion.

AILSHIE, J.—I cannot agree with some of the conclusions reached by my associates in this case. I concur in the result announced as to the instructions given the jury by the trial court, and also as to the alleged separation of the jury after they had been accepted and sworn to try the case. I do not think that the mere fact of separation is sufficient to entitle a defendant to a new trial, but that he must at least show some other facts from which it would appear that he was in some manner prejudiced on account of such separation.

There is a question, however, in this case of most vital and serious import to which I cannot give my approval. It goes to the introduction of a class of evidence given by the state's first witness and running throughout the entire case for the

prosecution. The first witness called by the prosecution was the health officer of Boise City, and after giving some testimony concerning the inmates of houses of ill-repute within the city and the steps being taken by the health officers to suppress disease prevailing among such persons, said: "I know a couple of women that were living with the defendant about this time." Thereupon the prosecution asked the question: "You may state whether or not about this time you examined these women, or either of them?" To this question counsel for defendant objected and the attorney for the state said: "We will connect this with subsequent evidence in the nature of threats showing a direct connection between the two"; whereupon the court overruled the objection. The witness then proceeded: "I examined both of these women; I don't know their names." Counsel for defendant here interposed further objections and was by the court overruled and the witness continued: "The brunette or dark-haired one I found had syphilis and refused to give her a certificate and notified the police. I think this was two or three days before the Levy body was found." After the witness gave further testimony along this line defendant's counsel moved to strike out all of the evidence on this subject, and thereupon the witness was asked: "You were acting under instructions from the police department as a member of the board of health?" To which he replied: "Yes, sir; I will explain. I think that at this particular examination one of the policemen spoke to me about it and ordered them to come up, and I think it was Carswell." After this answer was given the court overruled defendant's motion to strike out the evidence. Evidence to the same effect and of the same character was given on the part of the state by other witnesses.

It is argued with much force and convincing reason by counsel for defendant that this line of evidence was incompetent to prove any possible or material fact in the case against the defendant, and that it had for its object the sole tendency and purpose of prejudicing the jury against him. Of the fact that it did actually prejudice the minds of the jurors against the defendant I have no doubt. It was introduced under the pretext of showing threats, but how such evidence could pos-

sibly show, or tend to show, or be connected with any threats
on the part of the defendant against the deceased does not ap-
pear. How could the fact that these women with whom the
defendant had been associated had a loathsome and infectious
disease possibly .have any bearing on the defendant's guilt of
the crime of homicide? How could such fact become a
circumstance of the guilt of defendant? Is it possible that
it was introduced for any purpose other than that of de-
grading the defendant in the minds of the jurors? Was it not
an indirect attack upon the defendant's standing in the com-
munity and his general character and moral depravity?

In the majority opinion in justification of the admission of
this evidence, it is said: "It appears from the record that de-
fendant claimed and had stated that the deceased was the cause
of his having to leave the city, and, as we understand it, the
evidence last referred to was introduced to show that the de-
ceased had nothing to do with the matter; that the examination
of said female was suggested to the physician by a policeman
and that deceased had nothing to do with it." What did it
matter whether *deceased* was the cause of these women failing
to get a health certificate or the *police officers* of the city were
the *cause?* What possible light could that question throw upon
the guilt or innocence of the defendant? It certainly cannot
be said that any *motive* could be shown by this class of evi-
dence, and if *threats* were the real object the state had in view,
then it was certainly unnecessary to go into the physical condi-
tion and character of a couple of lewd and abandoned women
in order to lay the foundation for proving so simple a fact as a
threat.

In *People v. Wallace,* 89 Cal. 158, 26 Pac. 650, the supreme
court of California had under consideration the admissibility of
evidence very similar in character to that here introduced.
There a witness who had been an "actress" in a saloon or "dive"
was asked: "Since you have been working at the Elite theater,
has this man Wallace [the defendant] asked you to be his
girl?" That question was objected to and the objection was
overruled by the court, and upon its admission the appellate

court said: "The admission of this testimony was erroneous. It was not relevant to any issue involved in the case, and was clearly calculated to present the appellant before the jury as a low and degraded character. It may be that there are those who look with some indifference upon the moral delinquencies of men in their social relation with the other sex, if such conduct is not too flagrant and notorious. But even if this should be assumed as the fact, it would not follow that this evidence was not prejudicial, as its object, its declared purpose and effect, was to show that appellant had proposed to 'live' with this woman in a state of shameless immorality. . . . . The occupation of this witness, all of the surroundings and character of the so-called 'theater' in which she was employed, were fully disclosed by the evidence, and the proposition to 'live' with her, and she to become his 'girl,' looked to a relation which need not be characterized here, but which the jurors, as men of ordinary observation, must be presumed to have fully understood. But one inference could be drawn from this testimony, and that most prejudicial to the appellant, in the minds of men of average morality. The evidence having only this tendency, and being wholly irrelevant, should not have appeared in the case."

Closely connected and allied with this class of evidence and illustrating the character of evidence introduced in this case, and the effect that the same must have had upon the minds of the jurors—presuming that they were average jurors subject to the ordinary human prejudices and passions—was that of another witness as to the cruel character and disposition of the defendant. I quote the questions and answers as given: "Q. And you testified in regard to certain matters, threatening language and so on; I will ask you if there was any other occurrences in the nature of threatening language on the part of the defendant toward Davis Levy, the deceased? A. Yes, sir; in the latter part of November, 1900. Q. State the language and the circumstances? A. Why, he had a rabbit and was hanging it on the fence in the back yard on Mrs. Bush's property, and was skinning it right back of what is Maud Mudock's house now; and I was working on my house there, and I heard one of the French women holler to him, and then I heard a

rabbit squeal, so then I goes out there and I says, 'Why don't you kill it?' and I hit it with a stick."

At this point counsel for defendant objected to these details and thereupon the prosecutor asked: "Now, Mr. Maley, what was said on this occasion?" to which the witness replied: "Just as I was coming to it as I hit the rabbit over the head—he stopped and looked up and said, 'I skin Levy that way.'" The witness continued in detail concerning the skinning and killing of this rabbit. The whole of this testimony was apparently given under the pretense of showing to the jury that on this occurrence which was a year before the death of Levy, the defendant had remarked that he would *skin Levy*. It doesn't take a very critical examination of this to disclose the fact that the state introduced this evidence, not so much for the purpose of showing what the defendant had said, as for the purpose of getting before the jury the fact that he had *skinned a live rabbit,* and that he was therefore a man of a cruel and unfeeling disposition. In fact, counsel for the state in their brief give as a reason for sustaining the verdict of the jury, that "It is also made certain by the evidence that defendant is a cruel and vicious man."

My associates in discussing this evidence say: "This evidence was evidently introduced to show the malice and hatred of the defendant toward the deceased." Is it to be seriously contended that because a defendant was capable of skinning a live rabbit, or in fact did do so, it is a circumstance tending to show that he has murdered a human being? Or is the remark made by the defendant that he would like to skin the deceased that way isolated from any other fact whatever, at a period a year prior to the homicide, and where they had dealt together during all the intervening time, admissible to show malice in a case of homicide? I certainly think not. This seems to me to have been an indirect way of doing the very thing the law forbids. This was an attempt to show the bad moral traits and disposition of the accused—a thing condemned by all the text-writers and authorities on the subject. (Underhill on Criminal Evidence, sec. 85; Underhill on Civil Evidence, sec. 10; Rice on Evidence, secs. 375, 379.)

In line with this evidence two witnesses for the state were permitted to testify to certain isolated, specific acts of the defendant committed sometime previous to the death of the deceased, too revolting, odious and depraved in character to permit of recital here, but in line with the class of evidence which counsel for defendant claims had no other purpose and effect than that of prejudicing the jury against him. It is true, this evidence last referred to was not objected to by counsel for defendant, but it was of a nature so shocking and offensive to every sense of decency and morality that the damage must have been as effectually wrought by the asking of the question as by the answer.

Whether a defendant be guilty or innocent, and whatever his previous mode or condition of life may have been, he is nevertheless entitled to a fair trial. He should only be tried for the offense charged and not upon his general moral delinquencies and turpitude. If guilty, the state should secure a conviction upon *evidence* and not upon *prejudice* and *passion;* if innocent, it should not want a conviction for any consideration.

The fact that deceased came to his death by foul means is the only fact in this case proven by positive evidence. All the evidence tending to connect the defendant with the commission of the offense was purely circumstantial. A large part of the record in the case consists of the merest *suspicions* against the defendant, and cannot in a legal sense be said to even approach the dignity of *circumstantial evidence.* By this I do not mean to be understood as saying there are no circumstances in the case against the defendant. But I do mean that repeated examinations of this evidence have impressed me with the belief that the class of evidence above referred to must have had much to do with the conviction of the defendant, and that the verdict does not rest alone upon the legal circumstances shown against him. For these reasons I cannot agree with the conclusion of my associates wherein they hold that the admission of the class of evidence I have recited did not prejudice the rights of the defendant.

The principle of law announced in the majority opinion, to the effect that where a defendant has produced affidavits show-

ing that a juror had previously expressed an opinion hostile to the defendant, that the state might introduce affidavits in rebuttal showing the good character of the juror for truth and veracity, seems to me to be in such conflict with the law of evidence in similar cases that I cannot refrain from expressing my disapproval thereof. After a verdict had been rendered against the defendant his counsel discovered that one of the jurors, prior to being selected as a juror in the case, had made statements that he believed the defendant ought to be hung on general principles, etc. They accordingly presented the affidavits of those who had heard the statements made on this motion for a new trial. The state secured the affidavit of the juror denying ever having made such statement, and then proceeded to secure numerous affidavits showing that the juror's reputation for truth and veracity was good. In support of the admissibility of this evidence it is announced that "The truth and veracity of the juror was directly put in issue and directly attacked." If this position be true, then so soon as the defendant or any of his witnesses might go upon the witness-stand and directly contradict any positive fact testified to by a witness for the prosecution, the state would at once be entitled to ransack the community for evidence showing the good reputation of the contradicted witness for truth and veracity. There can be no difference in principle between the two instances. This certainly cannot be the rule as to the admission of evidence. It seems to me that the error lies in assuming that the *character* of the witness for truth and veracity has been attacked whenever he has been directly contradicted. It is when the *general character* of the *witness* for credibility is directly attacked, and not when the *character* of the *testimony* given in a specific instance is attacked and contradicted that sustaining evidence may be offered. If the rule announced in this case should prevail, there would be no end to the introduction of testimony in any given case, and the result would be that every witness who testified in a case would be shown to either have a good or a bad reputation. When defendant moved for a new trial on the ground that the juror had made statements which disqualified him from trying the case, the juror did not in any

sense become a defendant in that proceeding, but was a mere witness the same as any other person, and it was no more competent for the state to produce witnesses to show his reputation for truth and veracity than it would be in any other case where a witness was contradicted. (3 Rice on Evidence, sec. 379; *People v. Hulse,* 3 Hill, 309; *People v. Van Houter,* 38 Hun, 168; *Russell v. Coffin,* 8 Pick. 153; *Stevenson v. Gunning's Estate,* 64 Vt. 609, 25 Atl. 697; *Tedens v. Schumers,* 112 Ill. 266; *Louisville & N. R. Co. v. McClish,* 115 Fed. 268, 53 C. C. A. 60.)

Upon the motion for a new trial defendant presented in his affidavit newly discovered evidence, and among other things urged that the police officers of Boise City had taken undue advantage of him and influenced witnesses against him; and in support of that contention presented affidavits showing that a reward of some $3,000 had been parceled out among the police officers, and that one of the principal witnesses for the prosecution had obtained $1,500 of the reward, and that the chief of police and one of his subordinates had signed an obligation to pay $50 to the barber who had shaved the defendant on the night upon which it was claimed the homicide occurred, and to whose testimony considerable reference is made in the majority opinion. That document is as follows:

"Boise, Idaho, Feb. 22, 1902.

"This is to certify, that we, the undersigned, agree to pay J. L. Ragland, or order, the sum of $50 out of any reward we may receive from either the state of Idaho or the heir of Davis Levy."

This was signed by the chief of police and his subordinate officer. It also appears that after the trial the chief of police drew warrants for fees of witnesses who had testified on the part of the state in the aggregate sum of $591.50. He claimed in reply to this that he did it only as an accommodation. It is also made to appear that the inmates of the houses of ill-repute in Boise City, from which class most of the witnesses against defendant were drawn, were entirely dependent upon the police officers as to whether or not they should be allowed

to conduct such resorts. It is also shown that these places were closed by the police during the trial of this case and reopened as soon as the case was closed. Upon the trial of the cause the chief of police testified in relation to finding the body of the deceased: "I went into this office probably a few minutes after finding his body; there was no blood anywhere except on the face towel or gag." The witness testified to having examined the premises carefully, but made no mention of finding any blood stains anywhere in the building, and no evidence to that effect was given at the trial. Upon motion for a new trial, however, the defendant presented the affidavit of a reputable physician of Boise City, stating that soon after the body of Davis Levy was found, the chief of police called upon the physician and took him to the Davis Levy lodging-house. What then occurred is best shown by the language of the affidavit: "In the front room facing Main street on the west side of the stairway leading from Main street to the second story of said building, and right across the hallway from the office or living-room of Davis Levy, I found blood stains which had the appearance of being placed upon the door leading from the room on the west side of the hallway by the fingers or hand of someone as they unlocked the catch or latch of the door, and in said room I found also blood stains on the handle of a water pitcher; that I at that time took some of the stains and made a microscopic examination of them and found from said examination that the stains were caused by the blood of a human being; that I did not communicate the above fact to the defendant or either of his attorneys until after his conviction." This affidavit tends very strongly to corroborate the contention of defendant that the police officers were acting unfairly with him and suppressing evidence which might have thrown light upon the case. If no error had been committed in the admission of evidence, the newly discovered evidence in this case, and even the showing as to the conduct of the officers, might not justify a reversal of the case; but considered in connection with the mass of incompetent and prejudicial testimony to which I have referred, certainly presents a strong consideration for the granting of a new trial.

For the foregoing reasons I cannot agree to an affirmance of the judgment.

### ON PETITION FOR REHEARING.

(February 12, 1904.)

STOCKSLAGER, J.—Counsel for appellant file their application for a rehearing in this case. The individual members of this court gave this case the most thorough investigation, and after repeated discussion of every question involved in the record, reached the conclusion disclosed by the opinion and dissent of Mr. Justice Ailshie.

The very earnest, and we are satisfied sincere, manner in which counsel for appellant present this application and urge that there is error in the opinion has prompted me to again investigate the record as well as the authorities relied upon by appellant. We fully appreciate the grave responsibility resting upon the court and each member of it. We also appreciate the serious consequences to appellant necessarily following the opinion, but these are not questions which should in any manner affect the court. The facts of the case are fully stated in the opinion, and any that were omitted there are shown in the dissenting opinion of Mr. Justice Ailshie. This being true, it is unnecessary to review them here.

Counsel for appellant in their application start out with this statement: "The absolute conviction, in the minds of counsel for defendant, not alone that the defendant herein is absolutely innocent of the crime charged against him, but the certain knowledge that the defendant did not have a fair and impartial trial in the court below. Counsel being present at all stages of the case, were able to see and know of certain facts, incidents and influences outside of any evidence in the case which was brought to bear and made its impression upon the jury in this action. These things it is impossible to incorporate into the record in this court in any manner which would indicate to the court the effect they had upon the jury."

This only serves to remind us of the necessity of confining ourselves to the record as it comes from the lower court; any departure from this rule would leave us at sea for the facts

in the case. It is presumed that the trial court used every exertion to protect the appellant in his rights and to see that he had a fair and impartial trial, and we are not authorized to take this statement from counsel as bearing upon the question under discussion. If it is true, and we know nothing about it, it might appeal with much force to another tribunal of the state, but it has no place in this court.

Counsel next urge that the introduction of the evidence "showing that one of defendant's women had syphilis was wholly immaterial, and which was introduced for the purpose, and certainly had the effect, of prejudicing the jury against the defendant."

This statement is followed with a statement from the majority opinion, in which it is said: "The admission of that evidence was an immaterial error which could not possibly have affected the verdict of the jury, hence did not affect any substantial right of the defendant."

It must be remembered at all times in this case that the murder of deceased was shrouded in mystery. That he had been murdered was beyond controversy; that there was no direct evidence connecting the defendant, or anyone else, with the commission of the crime. It developed on the trial that ill-feeling had existed between appellant and deceased for some months prior to the homicide; threats made by appellant of various kinds had been made or were proven on the trial. It was shown that appellant believed deceased was responsible for the examination of the women referred to, and was thereby indirectly, if not directly, responsible for the order of the doctor prohibiting this one from carrying on her business. This, it was shown, enraged appellant, and in his anger he said he would fix him (meaning deceased) ; he would knock his d——d head off; said Levy and the policemen were making him trouble and he would leave. Counsel for the prosecution asked the city physician this question : "You may state whether or not about this time you examined these women or either of them?" Counsel for appellant objected to this question for the reason that "it is immaterial, incompetent and irrelevant as to what the condition of these women was; it has no connection whatever with

this defendant or with the crime charged against him; it is absolutely immaterial and made here for the purpose of prejudicing the defendant without connecting him in any manner with it."

Counsel for the prosecution stated: "We will connect this with subsequent evidence in the nature of threats showing a direct connection between the two. The physician answered: "The brunette or dark one I found had syphilis, and refused to give her a certificate and notified the police. I think this was two or three days before the body of Levy was found."

With this state of facts before the court, can it be said the evidence was immaterial, or that its admission was error? The relation between appellant and these two women was shown. The condition of one of them was also shown to be such that she was refused a certificate by the city physician. The fact that appellant suspicioned deceased with being in some way implicated with the police force in bringing about this examination was shown to have enraged appellant to such an extent that he made threats against deceased, thus verifying the statement of the prosecution. It was not an attempt on behalf of the prosecution to connect this appellant with any other crime, or to degrade him in the minds of the jury, but was for the purpose of showing his feeling toward deceased, and upon what such feeling was based. If it had been shown that the object of the evidence was to debase appellant in the minds of the jury, or that he was an immoral man, or that it connected him with some other misdeed, the contention of appellant, and his authorities, would be applicable. If the evidence of the condition of this woman and the fact that appellant believed that deceased was in some way instrumental in bringing about the examination by the physician had not been brought home to the appellant, and his threats directly connected with the result of the examination, then it would have been error to admit the evidence.

Counsel next urge that the admission of the evidence with reference to the "orange peel" was error. This testimony, as said in the opinion, as well as the dissenting opinion of Mr. Justice Ailshie, is too revolting to find a place in a living rec-

ord. Suffice it to say, however, that it is shown by the record that it was introduced for the purpose of showing the ill-will and hatred of appellant for deceased, and not that he had been guilty of other crimes, or for the purpose of degrading him in the minds of the jury. Can it be seriously urged that it was possible to so conduct this trial in the lower court without the relation of appellant and these two women being disclosed to the jury? All the surroundings were such that sooner or later this fact must come out. The class of witnesses on behalf of the prosecution who were residing in the "alley," the further fact that if the prosecution did not disclose the avocation of the witnesses who reside in the "alley," it was shown on cross-examination that the appellant resided in the "alley" with the two abandoned women, could not be kept from the jury. Can it be said that because one of the women had a loathsome disease and this fact was brought out by the prosecution, this alone prejudiced the jury against appellant? Is it not true that if any feeling of prejudice existed against the appellant in the minds of the jury that it was caused by his immoral conduct and manner of living? Jurors are selected with care by the defendant and should be by the prosecution, to avoid suspicion of bias or prejudice for or against the defendant, and if in the examination of a juror it is shown that he has any bias or prejudice, he is excused on that ground.

It was unfortunate for appellant that his lot had been cast among the residents of the "alley," and that the evidence upon which he was convicted was mostly from his associates there. It might be said that it was unfortunate for the state that it had to resort to that class of evidence for a conviction. The prosecution was not to blame for this, however. When it was discovered that a murder had been committed, it was the duty of the officers, as well as all good citizens, to ferret out the perpetrator of the crime and bring him to justice. A careful reading of the record in this case does not disclose any particular friendship for the deceased, or ill-feeling toward appellant on behalf of the witnesses who resided in the "alley." If anything can be gathered from the evidence of the witnesses from the "alley," it indicates that deceased was looked upon by them

as a harsh, exacting landlord. Counsel for appellant in their petition say: "If the opinion of the majority of the court in this case is to be the law governing such cases in this state, then in every prosecution the doors are open for the prosecution to introduce in evidence, immaterial facts and disgusting details of the moral delinquencies or bad character of a defendant in every criminal case."

If the facts in the case under consideration and the opinion of the majority of the court warrant this assertion, then indeed it is a deplorable condition, and we should not, and would not, hesitate to recall the opinion and grant the appellant a new trial. It is further stated that the principle announced in the majority opinion herein is not only opposed by the decisions of the supreme court of all other states, but if adhered to, overrules the prior decisions of this court upon which counsel for defendant relied. He cites *State v. Irwin, ante,* p. 35, 71 Pac. 608, 60 L. R. A. 716. This was the unanimous opinion of this court constituted of the same members as at the present time. Of this case counsel for appellant say: "This court reversed a judgment of conviction for the reason that counsel for the state in that case had asked a question of the witness which had a tendency to degrade the defendant and prejudice him in the minds of the jury. How much stronger is the case at bar than the Irwin case can be seen by mere comparison of the questions asked in the Irwin case and the evidence admitted in this case." In the Irwin case defendant was charged with rape, alleged to have been committed on one Dora Irwin on the fourth day of July, 1902. During the trial defendant called his son, Daniel Irwin, as a witness on behalf of the defendant, and on cross-examination this question was asked: "Did you not in the course of that conversation with Mary Phillips say also, in substance and effect, that you suspicioned your father with having done the same thing with other girls, mentioning one of your family? Did you not in the course of that conversation with Mary Phillips say also, in substance and effect, that your father's actions with the other girl—with the member of the family referred to—had caused your mother's death?" An objection was sustained to this question, but he

was required to answer the first question which was in the nega-
tive.  Other questions of a similar nature were asked.

How can it be said that this case has any application to the
case at bar?  Here was an attempt on the part of the prosecu-
tion to show a separate and distinct crime to the one alleged
in the information.  No bearing or relation whatever to the
crime for which defendant was being tried, hence, the only
effect of the evidence was to prejudice the minds of the jury
against the defendant, no difference what the object may have
been.

The next case cited from this court and upon which appellant's
counsel say they rely in *State v. Anthony,* 6 Idaho, 383, 55 Pac.
884.  This was also a rape case.  The defendant was convicted
of the crime of rape alleged to have been committed upon a girl
ten years of age.  "The errors assigned go to the sufficiency of
the evidence to sustain the verdict, and in *compelling the de-
fendant to testify* in regard to an alleged criminal assault on
a young girl by name of Marshall, alleged to have occurred
in 1895, and in allowing witness, Alfred Marshall, to testify in
regard to said alleged criminal assault."  The court, after re-
lating all the facts, says: "An attempt was made to discredit
and impeach the defendant by contradicting him in regard to a
particular wrongful act that had not the remotest connection
with the crime of which the defendant stood charged and was
convicted."  Has this case any bearing on the case at bar?
Here was a man on trial for rape alleged to have been com-
mitted at a certain time on a certain ten year old girl.  The
defendant was a witness on his own behalf and on cross-exam-
ination was questioned by the prosecution relative to a similar
offense with another girl about a year before the crime charged
to him and for which he was being tried.  The court said the
only effect of this evidence was to prejudice the jury, as it had
no relation whatever to the crime charged to the defendant and
for which he was being tried; hence error.

Counsel for appellant say the rule laid down in these two
cases is correct and in harmony with other courts that have
had this question before them.

Our attention is next called to *People v. Wallace,* 89 Cal. 158, 26 Pac. 650. Mr. Justice Ailshie in his dissenting opinion, quotes largely from this opinion, hence unnecessary here. It will be observed that the question objected to in this case related to the proposal of defendant to one of the inmates of the theater at a time previous to the murder, and had no relation or connection in any manner whatever to the crime charged to defendant. It was not shown that there would be any attempt to show by the evidence of the witness any threats or ill-will on behalf of defendant toward the deceased by an answer to the question. The court says: "The admission of this testimony was erroneous; it was not relevant to any issue involved in the case, and was clearly calculated to present the appellant before the jury as a low and degraded character."

I have no quarrel with either of these decisions. I also agree with counsel that the correct rule is pointed out in *State v. Anthony* and reiterated in *State v. Irwin.* I am in harmony with their contention that the authorities are uniform upon the question that evidence that defendant has been guilty of or committed other crimes than that with which he was charged is not admissible in evidence. When it comes to applying this law to the facts in the case at bar is where we come to the "parting of the ways." As heretofore stated, the defendant was on trial charged with the murder of Davis Levy. The evidence connecting the appellant with the commission of the crime was mostly circumstantial. Before he could be convicted of the crime it was necessary to show a chain of circumstances connecting him with it which included motive. To show his motive it was necessary to prove threats, and as a foundation for such threats his reasons for his ill-will and hatred for deceased. This directly connects the action of the city physician in refusing a certificate of health to one of the women with whom it was shown he was living, or had been living, in the "alley," and his statement that deceased and the police were causing him trouble and that he would have to leave the town; that he would get even with him, meaning deceased. Were all these facts permitted to go to the jury by the learned judge who tried this case in the lower court for the purpose of prejudicing the jury

against appellant, or were they admitted for the purpose of establishing a motive prompting appellant to take the life of deceased?

The law is not one-sided in its application; it applies to all alike. The state has rights that must be guarded as well as the defendant, and because appellant lived in a manner not commendable and made repeated threats of his intention to do deceased bodily harm, and shortly after these threats the body of deceased was found with evidence of a murder having been committed, it will not do to say that he can screen himself from the evidence of these threats because the very foundation of them grows out of his immoral life intimately and closely connected with his manner of living.

I have examined the authorities cited by appellant, and so far as the admission of the evidence complained of is concerned I have not changed my mind since concurring in the opinion of Chief Justice Sullivan. The careful inspection I have given to the record and authorities since this petition for rehearing was filed has convinced me that there is no error in the majority opinion wherein it is stated that the introduction of certain evidence was immaterial error. I will put it stronger and say there was no error in its admission.

Counsel for appellant say: "The court in its majority opinion states that the witness Ragland, who was to receive $50 of the reward in case of conviction, is corroborated by other witnesses. This statement is not borne out by the testimony. The testimony of all other witnesses as to the time the witness Ragland went to Weil's cigar store and the time when the defendant went there do not agree. Ragland testified that defendant came in there a half hour after he did, whereas four other witnesses who were in Weil's cigar store at the time testified the defendant came in within five minutes after the time Ragland did, and yet the court in its majority opinion says it was an important fact that the defendant did not arrive at Weil's store until half an hour after Ragland did."

I have read the majority opinion very carefully to find the language charged to the court in the latter part of the above statement, but am unable to find any such statement. I will

state here, however, that the witness Ragland was corroborated in nearly all his statements; that appellant went to the barber-shop a few minutes before 8 o'clock and got a bath and shave, and that he did not leave there until some minutes after the blinds were drawn; was corroborated by the witness Maupin that Ragland went from the barber-shop to Weil's cigar store, and that he was at the cigar store when appellant came in is also corroborated by Maupin; says that Ragland came in a little after 8 o'clock and that appellant came a little afterward—ten or fifteen minutes past 8. Jacob Cohn said he saw appellant at Weil's cigar store a few minutes after 8 o'clock; he remained there from 8 to 10 o'clock; Ragland came in after 8 o'clock; "it might have been half-past 8 o'clock when Ragland came in; I don't know which came in first; have no way to fix the time when either came in." Jule Weil and L. Weil fixed the time when both appellant and Ragland came to their cigar store by the time they respectively go and come from their meals, at one time saying it was before 8 o'clock when appellant came to the store, but taking their testimony in its entirety, it is shown that they, like the witness Cohn, had no definite way of fixing the time. The witnesses, Ragland and Maupin fixed the time by the hour the barber-shop was closed, which it is shown is promptly at 8 o'clock. It is shown by the evidence of L. Weil that appellant left his place of business about 10 o'clock that night, and he fixes the time by the hour the busses go to the depot. The careful inspection I have given to the evidence in this case, as well as the authorities cited by appellant, fails to convince me that there is any reason why the majority opinion should not stand as the judgment of the court. It is so ordered.

Sullivan, C. J., concurs.

AILSHIE, J., Dissenting.—I am still of the opinion heretofore announced by me in this case. I utterly fail to see how, under any recognized rule as to the admission of evidence, the testimony recited in my dissenting opinion could have possibly become admissible. To say that it established a *reason* for the defendant's ill-will and hatred of deceased does not, to my mind, answer the objection raised to its introduction.